PEOPLE OF PORTO RICO, REPRESENTED BY GUILLERMO ESTEVES, COMMISSIONER OF THE INTERIOR, Plaintiff and Appellee, *v.* NARCISO AND VIOLANTE RABELL CABRERA, Defendants and Appellants.

No. 4082. Argued November 17, 1926.—Decided December 23, 1926.

*García Méndez & García Méndez* for the appellants. *Attorney General George C. Butte, Assistant Attorney General Felipe Janer, Jr.,* and *Antonio Piñeiro* for the appellee.

MR. JUSTICE WOLF delivered the opinion of the court.

This is an appeal from an order of the District Court of Aguadilla refusing to issue an injunction to restrain Guillermo Esteves and others from inundating the land of the appellants, Narciso and Violante Rabell Cabrera. The People of Porto Rico had begun a condemnation proceeding

against the said appellants. The petition for injunction was an incident of that suit. The court denied the petition. As one of the grounds for denying the application for an injunction was that The People of Porto Rico was immune from suit without its own consent, and another was that irreparable damages had not been shown, it seems advisable to transcribe a part of the pleadings.

The beginning of said complaint reads as follows:

"Now comes the People of Porto Rico, represented by the Honorable Guillermo Esteves, Commissioner of the Interior of Porto Rico, and he in his turn by the Honorable G. C. Butte, Attorney General, and the attorneys Antonio Piñeiro, attorney of the Irrigation, and the *fiscal* of the district, and respectfully alleges:

" 'That the complainant, the People of Porto Rico, is a body politic with capacity to sue and be sued, duly organized in accordance with an act of Congress of the United States of America dated March 2, 1917, and entitled "An Act to provide a Civil Government for Porto Rico, and for other Purposes;" that the Commissioner of the Interior, Guillermo Esteves, appears in representation of the People of Porto Rico by virtue of the authority which has been conferred upon him by section 10 of Act No. 63, approved the 19th day of June, 1919, providing for the construction of a system of irrigation in the neighborhood of Isabela, Aguadilla and Moca.' "

After describing the lands and other matters, in paragraph 7 of its complaint The People of Porto Rico sets forth the efforts that its agents had made to obtain the lands of the said appellants by negotiation; that the said lands were worth between $26,000 and $27,000, according to the estimate of the agents of the complainant, including, in the opinion of the complainant, any other class of damages that the appellants might suffer.

The 8th paragraph of the complaint sets forth "that the complainant makes this petition of condemnation of said lot for the purpose of constructing the dam (*represa*) of Guajataca in the service of the irrigation of Isabela. Therefore, the commissioner prays the court to render judgment in its favor declaring that public utility and necessity require the

condemnation of the lots of land previously referred to, and that said complainant has a right to take and to retain the described lots of land for the public use specified upon the payment (*mediante el pago*) of the compensation which shall be determined by this court, fixing the amount that the complainant has to pay to the defendants, for the said lands, as well as the damages which this condemnation causes.''

We therefore do not question that the condemnation proceeding was brought by the People of Porto Rico in its sovereign or quasi-sovereign capacity and that the condemnation was sought by virtue of a special act of the Legislature passed on the 19th of June, 1919. The certificate from the secretary of the district court shows that the condemnation proceeding had not been heard on its merits and was not ready for trial. On the 19th of October, 1926, the defendants presented the following petition for an injunction:

''Now come the defendants in this case, by their undersigned attorneys, and respectfully allege:

''1. That in this case the People of Porto Rico has brought a condemnation proceeding against these defendants with the purpose of depriving them of and of condemning certain parcels of land belonging to them, amounting to 314.54 *cuerdas*, located in the ward of Guajataca, San Sebastián, which parcels are described in the complaint of said condemnation proceeding as follows: (The lands are described). These parcels are a segregation from a property called Esperanza in the ward of Guajataca of San Sebastián, judicial district of Aguadilla, P. R., and consist of 1237.28 *cuerdas* belonging to these defendants.

''2. That in the said complaint of condemnation it is alleged that said lands are of absolute necessity to and indispensable for the People of Porto Rico in the construction of the Guajataca dam which forms part of the Public Irrigation System of Isabela.

''3. That after the complaint was filed these defendants filed their pleadings consisting of motions upon the nullity of the appointment made by the Governor of Porto Rico of Judge Castejón and the said motions were overruled, the court granting an extension of time for filing new pleadings against said complaint, and the time for so doing not having expired.

"4. That the questions of fact against said complaint of condemnation have not been raised as yet, and the People of Porto Rico has not obtained a decree from any court for the condemnation of said lands or fixing the amount of compensation or damages to be paid for them, and the case is not ready for trial, for which reason such decree could not have been obtained.

"5. That the complainant in this case, against the will of the defendants and in spite of the fact that it was requested to refrain from so doing, has commenced to inundate the lands above referred to, parts of which are under cultivation; and said complainant intends to continue inundating said lands and insists in doing so, without the consent and against the will of these defendants.

"6. That if the complainant continues to inundate the lands of defendants described in this petition, all the plantations of the defendants in this case will be destroyed, as well as the fences, roads and watering places for cattle on the above mentioned tracts of land, and, in general irreparable damages would be caused to these defendants which it would be difficult to ascertain after said lands are inundated; and which would still be more difficult to recover, as the complainant is the People of Porto Rico, and, besides, defendants would be compelled to bring a special suit for damages against the People of Porto Rico; and that such act of complainant violates and destroys the right of property of the defendants on the parcels of land above mentioned, and infringes section 355 of the Civil Code and makes the ownership of property illusory, constituting an abuse on the part of the People of Porto Rico; and, finally, it violates the Fifth and Fourteenth Amendments of the Constitution of the United States, the first of which provides that no person shall be deprived of his private property for public use without just compensation, and the second, that no person shall be deprived of his property without due process of law.

"7. That if this petition for an injunction is not granted the complainant will continue the said violations, as well as the inundations of the lands of these defendants.

"FOR THE FOREGOING REASONS, these defendants pray this court to issue a writ of injunction directed to the Commissioner of the Interior of Porto Rico, Hon. Guillermo Esteves, representing the People of Porto Rico, and to his representatives, agents, employees and deputies commanding them to refrain from continuing the acts above referred to until the condemnation proceeding is decided in its favor, warning the complainant and its representatives, agents,

employees and deputies that if they disobey the order of the court they will be guilty of contempt."

1. The first defense of The People of Porto Rico to the application for an injunction was its immunity from suit without its own consent. In parts of its argument apparently The People of Porto Rico contends that there has been no "taking" of the appellant's land within the prohibition of the Organic Act of Porto Rico. We find it advisable, therefore, to consider whether the facts in this case show a taking. The effect of the inundation, while not transferring the title of the lands to The People of Porto Rico, would deprive the appellants of the use and enjoyment of the said lands and would therefore be a taking within the definitions of the Supreme Court of the United States and other courts. The leading case in this regard is *Pumpelly* v. *Green Bay Co.*, 13 Wall. 166, 168, cited by appellants. There the court held, with Mr. Justice Miller as its spokesman, that it was not necessary that property should be absolutely taken, in the narrow sense of the word, to bring the case within the protection of this constitutional provision; and that there might be such serious interruption to the common and necessary use of property as would be equivalent to a taking within the meaning of the Constitution; that there would be a very curious and unsatisfactory result if it should be held that where the government refrained from the absolute conversion of real property to the uses of the public it could destroy its value entirely and could inflict an irreparable and permanent injury to any extent, because in the narrow sense of the word the property was not taken for the public use. The court analyzed the authorities prior to 1871 and held that where real estate was actually invaded by superinduced additions of water, earth, sand or other materials, or by having any artificial structure placed on it, so as to effectually destroy or impair its usefulness, this was a taking within the meaning of the Constitution. The leading case was

cited by us in *American R. R. Co.* v. *Quiñones,* 15 P.R.R. 1, where we said:

"Ownership of land is exclusive and does not tolerate a use of the land acquired by another for purposes inconsistent with and opposed to the owner's rights, and to irreparably damage the property of the owner is to that extent to deprive him of it, and he is protected by the law from any such aggression."

*U. S.* v. *Lynah,* 188 U. S. 445, and cases cited, support the leading case, as does also *U. S.* v. *Grizzard,* 219 U. S. 180. The principle is set forth in Lewis on Eminent Domain, 3rd Ed., pp. 66, 90, 100, 144, 554, and elsewhere.

*Stockdale et al.* v. *Rio Grande Western Ry. Co.,* 77 Pac. 849, held that any substantial interference with private property which destroys or materially lessens its value, or by which the owner's right to its use and enjoyment is in any substantial regard abridged or destroyed, is a taking, citing numerous cases. Other authorities to the same effect are *Vanderlip* v. *City of Grand Rapids et al.,* 73 Mich. 522, 41 N. W. 677, 3 L.R.A. 249, 16 A.S.R. 597; *Elser* v. *Gross Point,* 223 Ill. 230, 79 N. E. 27, 114 A.S.R. 326; and note to *Gordon* v. *Ellinville,* 47 L.R.A. (N. S.) 462.

Section 10 of Act No. 63 of 1919 provides as follows:

"The Commissioner of the Interior, his officers, agents, or employees shall have the right to enter, after notifying the owner or his representatives, upon any lands to make surveys and to locate and establish any of the works contemplated or embraced in said irrigation system, including the lines of any canal, road, tunnel, reservoir site, aqueduct, power station, transmission lines or other requisite; but indemnity shall be paid to the owner for such damages as he may incur in consequence of such works. The Commissioner of the Interior shall have the power, when necessary, to initiate condemnation proceedings in the name of The People of Porto Rico, for the acquisition of any land or right embraced within the approved plans of the said irrigation project, and for the purpose of such condemnation proceeding all land, all rights-of-way for the transmission of water and electric currents, all sites for reservoirs, canals, roads, tunnels, aqueducts, ditches, power stations and other

things embraced in and contemplated by said irrigation plan, so approved, are hereby declared to be works of public utility and, as such, subject to the power of eminent domain and open to expropriation proceedings in the manner provided by law; *Provided, however,* That all said rights and things may be made subject of condemnation proceedings without compliance with those provisions of law requiring a declaration of public utility by the Executive Council, pursuant to the Act approved March 12, 1908, entitled 'An Act to amend an act entitled ''An Act to provide for the condemnation of private property for the purpose and under the conditions therein named,'' approved March 12, 1903,' or any other provisions of law relating to declarations of public utility; *And provided,* That the Commissioner of the Interior shall at all times have authority to acquire for said irrigation system such rights and things wherever possible, by settlement out of court to avoid condemnation proceedings; *And provided, further,* That the Commissioner of the Interior is hereby authorized and empowered to exchange, with the approval of the Executive Council, watering troughs for cattle for any land that The People of Porto Rico may need to acquire for the construction, maintenance or operation of the main canal and of the high laterals of the said irrigation 'system.''

Whatever other construction may be put upon this section, it does not attempt to authorize a taking without just compensation in the cases forbidden by law.

2. The nature of eminent domain has been before this court, principally in *American R. R. Co.* v. *Quiñones, supra.* Through Mr. Justice MacLeary, among other cases, we cited *Saldaña et al.* v. *School Board of Carolina,* 14 P.R.R. 339, to the effect that such a right should be exercised according to law and taking into consideration the right of the property owners to just compensation.

3. The petition for an injunction, which must be taken as true for the purposes of this appeal, recites that the Commissioner of the Interior has inundated and proposes further to inundate the lands of the appellants and hence would destroy the lands, roads and fences and make them useless for cultivation. Here, owners are threatened with a deprivation of the use of their lands and this would constitute a

taking without just compensation unless the statutes of Porto Rico make provision for just compensation without previous payment.

4. Where the Constitution or the laws do not require prepayment in condemnation proceedings, and an adequate fund is put at the disposition of a property holder, sometimes property may be taken before the actual condemnation, but neither the Organic Act, nor the Civil Code, nor yet Act No. 63 of 1919 make any sufficient provision, prior to the judgment of condemnation, for the protection of the appellant. Section 355 of the Civil Code makes it apparent, as the complaint itself presupposes, that the rule in Porto Rico, as in many of the states, makes a pre-payment of compensation necessary before title to lands is transferred. The decisions make it clear that in states where pre-payment is required there can lawfully be no taking or entry into property until the owner is compensated. We need not wander far afield for authority because we find it in the case of *American R. R. Co.* v. *Quiñones,* 15 P.R.R. 1, *supra.* There it was strongly held by the court that pre-payment was a requisite before title passed.

5. Assuming for the moment, with the Attorney General, that all of the acts here committed are those of The People of Porto Rico, the latter can not be considered to be immune from suit, because when The People of Porto Rico steps into a court to ask for a condemnation proceeding against property owners its consent to suit to respond to actions of its officers espoused by the government must be conclusively presumed. This follows from the case of *People of Porto Rico* v. *Ramos,* 232 U. S. 627. There it was held that while Porto Rico may not in ordinary actions be sued without its consent, a voluntary appearance after due consideration and a request to be made a party by the Attorney General on the ground of interest in the controversy amounts to a consent, and thereafter Porto Rico could not object to the jurisdiction on account of its immunity as a sovereign.

*Porto Rico* v. *Rosaly*, 227 U. S. 270, was distinguished. The court questioned, where an escheat was claimed, whether consent was necessary. However, if in that case consent was to be presumed, the present appeal presents a stronger case because The People of Porto Rico voluntarily came into court to attempt to condemn the lands of these appellants.

6. Another aspect of the case would be that if the application of the appellants for an injunction was otherwise proper the equity court will estop The People of Porto Rico from setting up its own immunity in a suit already begun by it. We shall see presently that injunction is the proper remedy, perhaps the only remedy.

7. A local act passed by the Legislature authorizes a suit of revendication against The People of Porto Rico (Act No. 76 of April 13, 1916). If injunction otherwise lies, then such a suit is the revendication, where private property is taken without just compensation.

8. Despite the foregoing reasoning to show that The People of Porto Rico, or its officers in their official capacity, might be proceeded against in this case, we are of the opinion that the things done here are not to be construed as the acts of The People of Porto Rico, but individually the acts of the officers in charge of the irrigation project. We must assume from the petition in injunction that there was no emergency like a war or a great menace to public health which made it necessary to take this property immediately and without waiting for the judgment in condemnation, and that is what these officers did. A few weeks more, or perhaps a few years more, was better than the possibility of committing a wrong on citizens of Porto Rico.

The act of the officers of the government in inundating the property before the judgment in condemnation must be considered a tortious one, as we have declared in the case of *Central Victoria* v. *Kramer,* 35 P.R.R. 168. See also *Harrison* v. *St. Louis and San Francisco R. R.,* 232 U. S.

318, 332. Hence the individual officer may be enjoined in the suit.

This application for an injunction is an incident to the suit already begun as countenanced by the injunction law itself in paragraph 3. (Act of March 8, 1906). The People of Porto Rico by the Act of 1919 authorized its officers to condemn this land, but it did not authorize them to take before condemning.

9. We come, then, to the question of whether injunction is the proper remedy, and we shall first refer to some of the decisions of the various courts, especially as in this class of cases we have in Porto Rico no great body of jurisprudence to draw upon.

In *Lowery* v. *City of Pekin*, 55 N. E. 1062, 186 Ill. 387, 51 L.R.A. 301, the court held:

> "It is said that the city can not be enjoined from thus using and holding the possession of the property of plaintiff in error for the purposes of a public highway upon the alleged ground that plaintiff in error, if he has suffered any wrong, has a remedy at law, either in ejectment for the recovery of the possession of his property, or in trespass to recover damages thereto. But this is not a case where it is sought to enjoin a simple trespass. This is a case where a municipality, under claim of right, is unlawfully trying to take the property of a private citizen. It is well settled that injunction is a proper remedy where cities or public officers, under color of power or claim of right, are illegally attempting to injure, or take the property, or impair the rights, of a citizen." (Citing cases).

The court continued: "The injury here complained of is one of a continuing or permanent nature, for which an action at law does not afford a complete and adequate remedy."

Holding that no property had really been taken in that case, the court, in *Birmingham Traction Co.* v. *Birmingham Railway & Electric Co.*, 119 Ala. 129, 43 L.R.A. 233, said:

> "It is only where a party authorized by law to exercise the right of eminent domain proceeds in its exercise without a legal ascertainment and payment of compensation, by condemnation proceedings,

that a court of equity will enjoin, without regard to the question of irreparable injury or adequacy of legal remedies.'' (Citing cases).

In *State ex rel. Cotting* v. *Sommerville, Judge,* 104 La. 74, 28 So. 977, the court held that even though the property was subject to expropriation and that proceedings would only result in a judgment for money, it by no means followed that possession of the property should be taken from its owner prior to the payment of the same; that the retention of one's property, even in expropriation proceedings, until just and adequate compensation was paid, was secured by the Constitution and that there was no legal justification authorizing invasion of this right by permitting the possession to be changed by giving a bond to the owner; that the court was bound to assume that a deprivation of a right secured to a person by constitutional guaranty worked *per se* an irreparable injury; that if relator's allegations were true a tort and a trespass had been committed, and that in such case the court could not authorize the continuance of such an act by or through the giving of a bond; that the relator was entitled to retain possession of his property until just and adequate compensation should be first made to him and that that right could not be defeated by mere consideration of public convenience. The court cited cases to show that ''usurpations and wrongs to private rights of property can not be justified by any considerations of benefits to commerce, and the right of expropriation of private property can only be exercised according to the forms of law.''

In *Osborne* v. *Missouri Pacific Railway Co.,* 147 U. S. 248, the relief was denied. The court, through Mr. Chief Justice Fuller, said:

''Equitable jurisdiction may be invoked in view of the inadequacy of the legal remedy where the injury is destructive or of a continuous character or irreparable in its nature; and the appropriation of private property to public use, under color of law, but in fact with-

out authority, is such an invasion of private rights as may be assumed to be essentially irremediable, if indeed relief may not be awarded *ex debito justitiae.*"

Under the article of Eminent Domain in 10 R. C. L., page 228, it is set forth:

"When an illegal entry upon private land under color of eminent domain is undertaken or threatened, it will be restrained by a court of equity without regard to the customary requirements of equitable jurisdiction. If public officers, or a corporation having the power to take land for public use, attempt to make an appropriation in excess of the power granted by the legislature or without complying with the conditions of the grant, an injunction will be issued as of course, even if the damage to the owner is trivial. The equitable jurisdiction in such a case is based upon the attempted misuse of the sovereign power delegated by the legislature and upon the inequality of the parties by reason of the grant of a prerogative right to one of them."

10. As has been frequently held, where damages are merely consequential equity will not interfere, but otherwise when taking exists.

The case cited by the government from the United States Supreme Court, namely, *Transportation Co.* v. *Chicago,* 99 U. S. 635, relates to incidental or consequential damages and not to a taking. The court took as a premise that private property might not be taken without just compensation and then said: "But acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though their consequences may impair its use, are universally held not to be a taking within the meaning of the constitutional provision." To show the difference between a taking and merely consequential damages, the following citations also apply: *Richards* v. *Washington Terminal Co.,* 223 U. S. 554, L.R.A. 1915-A 887; *Callenden* v. *March,* 1 Pick. 418, 429; *Elser* v. *Village of Gross Point,* 223 Ill. *supra; Detroit* v. *Beckman,* 34 Mich. 125; *Vanderlip* v. *Grand Rapids,* 3 L.R.A. 247, *supra,* and note.

11. In no case that we have found, especially where pre-payment is a requisite of the statute, has it been held that inundation of lands is not a taking. The damages that would result here, according to the decisions, are of a permanent and presumptively irreparable character. It matters little that a judgment in condemnation might speedily be forth-coming, inasmuch as under all the decisions, where pre-payment is required, the property owner is entitled to the use and enjoyment of his property until just compensation is actually in his hands after a judgment, or at least a tender of such just compensation after the said judgment. The motives that a property owner might have for refusing an offer made to him by the Commissioner of the Interior play no role. His motives might be entirely bad; nevertheless, the presumption is to the contrary, and such a presumption exists to benefit bona fide holders. A man might even have nothing but a sentimental reason for holding his property, such as that it had been the homestead of his family for many years. We agree with the government in this case that no declaration of utility by the Executive Council was necessary, inasmuch as the Legislature had determined a different mode for the declaration of utility. However, if the mere offer or tender of payment into court of the supposed just compensation would justify the taking of property *pendente lite,* then private property might be taken without any showing that the particular property was useful or necessary for the public.

Under the facts of the petition the defendants were entitled to an injunction and the judgment must be reversed. We are of the opinion that the injunction should be granted as a matter of course, but as some question of fact might be raised the case should be sent back for further proceedings not inconsistent with this opinion.

Mr Justice Hutchison took no part in the decision of this case.